# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2093

_____

Olga Despotis Trust

*Plaintiff- Appellant*

v.

The Cincinnati Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 7, 2017
Filed: August 16, 2017

_____

Before RILEY,[1] Chief Judge, GRUENDER, Circuit Judge, and GRITZNER,[2] District Judge.

_____

GRITZNER, District Judge.

---

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

[2]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

Olga Despotis Trust (the Trust) appeals the district court's[3] grant of summary judgment in favor of Cincinnati Insurance Company (CIC) on the Trust's claims for breach of contract, vexatious refusal, and declaratory judgment. We affirm.

## I. BACKGROUND

On December 31, 2010, a tornado destroyed a building leased as a medical imaging facility located in Sunset Hills, Missouri, which was owned by the Trust and insured by CIC. On February 15, 2011, the trustee, Dr. George Despotis (Dr. Despotis), executed a proof of loss form to CIC, claiming a loss in excess of the policy's limits and alleging the actual cash value (ACV) of the building at the time of loss was $1,400,000. CIC, on the other hand, determined that at the time of the loss, the ACV of the building was $800,000. Within fifteen days of the Trust's submission of its proof of loss, CIC presented the Trust with a check for $813,931, which included the undisputed $800,000 ACV amount. The Trust insisted that additional funds were due, and it disputed CIC's loss value determinations.

Because the loss value was in dispute, on April 19, 2011, CIC sent the Trust's attorney a letter invoking the policy's appraisal provision, which allowed either party to request an appraisal in the event of a dispute regarding the amount of covered damages. The Trust responded to CIC's request, stating it deemed appraisal "unproductive" and proposing a settlement. J.A. at 166. CIC declined the settlement offer and again requested the Trust's cooperation with the appraisal. In reply, the Trust asked CIC for various assurances regarding the appraisal process, noting that appraisal would leave unresolved issues, and advising CIC it would be filing legal action within days. Addressing the Trust's request for assurances regarding the appraisal process, CIC advised that appraisal would be binding on both the insured and the insurer under the terms and conditions of the appraisal provision. CIC also

---

[3]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

informed the Trust that the purpose of the appraisal process was to resolve all disputes between the insured and the insurer regarding covered damages. One week later, the Trust filed a lawsuit in Missouri state court seeking damages for breach of contract and a declaratory judgment that the appraisal provision of the policy was unenforceable. CIC removed the case, but eighteen months later, the case was voluntarily dismissed without prejudice. The Trust then filed the present lawsuit in the Eastern District of Missouri, alleging the same breach of contract (count one) and declaratory judgment (count three) claims, and an additional claim for vexatious refusal (count two).

CIC filed a motion for summary judgment on count three, asking the court to order appraisal. The court granted CIC's motion, ordered the parties to participate in appraisal, and stayed the case. Olga Despotis Tr. v. Cincinnati Ins. Co., No. 4:12-CV-2369 RLW, 2014 WL 5320260, at *2 (E.D. Mo. Oct. 17, 2014). On August 4, 2015, the appraisal panel issued its decision, declaring an ACV loss of $1,056,000; the panel also determined the total replacement cost to be $1,500,000, and lost rent to be $94,000. As a result of the appraisal, CIC paid the Trust the remaining ACV ($256,000) and an additional $22,658.28 for lost rental income.

The Trust insisted it was entitled to the building's replacement cost, rather than simply the ACV of the loss, and moved to amend its complaint to add allegations in its breach of contract claim that CIC failed to pay replacement cost and/or interfered with the Trust's ability to pursue the replacement cost provision of the policy. The policy's replacement cost provision stated replacement costs would be paid only if "the repairs or replacement have been completed or at least underway within 2 years following the date of the 'loss.'" J.A. at 175. The district court denied the motion to amend, concluding "the amended complaint would require additional discovery that would necessarily delay resolution of this already extremely protracted litigation" and that this "unexcused delay would unduly prejudice Defendant because of the

advanced nature of this case." Olga Despotis Tr. v. Cincinnati Ins. Co., No. 4:12-CV-2369 RLW, 2015 WL 8481863, at *1 (E.D. Mo. Dec. 8, 2015).

The parties filed cross-motions for summary judgment on the remaining counts one and two, and the district court granted summary judgment in CIC's favor. Regarding the Trust's claim that CIC breached the contract by making a loss payment based on a flawed calculation of the ACV, the district court reasoned, "The Trust cannot maintain a claim for breach of contract based upon a payment that occurred in March 2011, prior to when the parties fully engaged in the appraisal process provided for in the Policy," which was not completed until August 2015. Olga Despotis Tr. v. Cincinnati Ins. Co., No. 4:12-CV-2369 RLW, 2016 WL 831933, at *3 (E.D. Mo. Feb. 29, 2016). The district court also reasoned CIC could not have breached the contract by not paying the replacement cost because the Trust failed to replace the damaged property within two years of the date of loss, as the provision required. Id. The court further found a vexatious refusal claim could not be maintained based on conduct that occurred prior to the completion of the appraisal process, reasoning that such a holding would subvert the appraisal process. Id. at *5.

The Trust appeals the grant of summary judgment, arguing genuine issues of material fact preclude summary judgment as to whether CIC waived its right to invoke the appraisal provision and whether CIC breached the policy by refusing to pay the Trust the replacement cost.

## II.    DISCUSSION

We review the district court's grant of summary judgment and its interpretation of the insurance policy de novo. Gohagan v. Cincinnati Ins. Co., 809 F.3d 1012, 1015 (8th Cir. 2016). "Summary judgment is appropriate only when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Id. (internal citations and quotation marks omitted). "When, as here, federal jurisdiction

-4-

is based on diversity of citizenship, '[s]tate law governs the interpretation of insurance policies.'" Burger v. Allied Prop. & Cas. Ins. Co., 822 F.3d 445, 447 (8th Cir. 2016) (alteration in original) (quoting Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 861 (8th Cir. 2012)). It is undisputed that Missouri law applies to the claims in this case. Thus, "we are bound by the Supreme Court of Missouri's decisions." W. Heritage Ins. Co. v. Asphalt Wizards, 795 F.3d 832, 837 (8th Cir. 2015).

## A.     Enforcement of the Appraisal Provision

The Trust argues the district court erred by concluding CIC had not waived its right to invoke the appraisal provision and then by enforcing the provision. The Trust argues waiver occurred because CIC did not identify an appraiser within twenty days of the written demand for appraisal as required by the provision. The Trust asserts the district court failed to view the evidence in the light most favorable to the Trust and failed to allow an inference that the Trust was not reluctant to engage in the appraisal process but was merely seeking confirmation that CIC would be bound by the outcome of the appraisal. Citing "entrenched principles of insurance law," Appellant's Br. 34, the Trust further argues that by recognizing the existence of an *arbitrable* dispute, CIC impliedly waived its right to *arbitrate*, which the Trust equates with CIC's appraisal right. The Trust's final assertion is that CIC only invoked the appraisal provision for the disputed actual cash value whereas the district court erred by sending the entire case, including replacement cost, for appraisal.

### 1.     Appraisal Provision

The policy's Appraisal Provision[4] states as follows:

---

[4]The Trust notes that in its letter of April 19, 2011, CIC did not cite the Missouri changes endorsement to the policy's appraisal provision. A comparison of the provisions shows that the only relevant difference is that the Missouri provision sets time limits for the steps of the appraisal process. It is clear from the record that the parties did not engage an appraiser, which, as CIC contended and the district court

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of the written demand for appraisal. The two appraisers will select an umpire. If they cannot agree upon an umpire within 15 days, we or you may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. The umpire shall make an award within 30 days after the umpire receives the appraisers' submissions of their differences. A decision agreed to by any two will be binding. Each party will
> a.    Pay its chosen appraiser; and
> b    Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

J.A. at 176.

### 2.    Enforceability

As an initial matter, the Trust alleged the appraisal provision was vague because it did not address what would happen if the neutral appraiser did not agree with one of the party's appraisers, and that it was unenforceable because it allowed CIC to retain the right to deny the claim even after appraisal. The Trust also contends the appraisal provision was unconscionable because it required the Trust to pay part of the appraisal cost.

The possibility both parties could disagree with the umpire's decision did not render the appraisal provision ambiguous. "Ambiguity does not arise merely because the parties disagree over the meaning of a provision, and courts may not create ambiguity by distorting contractual language that may otherwise be reasonably

---

agreed, CIC was not required to identify due to the Trust's failure to engage in appraisal.

interpreted." Woods of Somerset, LLC v. Developers Sur. & Indem. Co., 422 S.W.3d 330, 335 (Mo. Ct. App. 2013); see also Home Builders Ass'n of Greater St. Louis, Inc. v. City of Wildwood, 107 S.W.3d 235, 239 (Mo. 2003) ("Where a provision's language is clear, courts must give effect to its plain meaning and refrain from applying rules of construction unless there is some ambiguity."). Invoking a hypothetical situation—such as both parties disagreeing with the umpire's decision, which did not even occur in this case—does not create an ambiguity where none exists. See Haggard Hauling & Rigging Co. v. Stonewall Ins. Co., 852 S.W.2d 396, 401 (Mo. Ct. App. 1993) ("The rule requiring that an insurance policy be construed favorably to an insured in cases of ambiguity does not permit a strained interpretation of the language of the policy in order to create an ambiguity where none exists.").

Nor was the provision unenforceable because CIC retained the right to deny the claim based on a defense or exclusion. Under Missouri law, "[a] provision in an insurance policy for the amount of the loss to be ascertained by appraisers in case of disagreement in relation thereto is binding and enforceable, and must be complied with before a right of action accrues to the insured." Lance v. Royal Ins. Co., 259 S.W. 535, 535 (Mo. Ct. App. 1924). "[W]here the parties' disagreement is over the amount of loss, appraisal is appropriate." Certain Underwriters at Lloyd's, London Subscribing to Certificate No. IPSI 12559 v. SSDD, LLC, No. 4:13-CV-193 CAS, 2013 WL 2403843, at *8 (E.D. Mo. May 31, 2013) (citing Lance, 259 S.W. at 535). Defenses and exclusions, on the other hand, are coverage issues, which cannot be resolved through the appraisal process. See Am. Family Mut., Ins. Co. v. Dixon, 450 S.W.3d 831, 836 (Mo. Ct. App. 2014) ("[A]ppraisal provisions in an insurance policy apply only if the dispute between the parties relates to the amount of the loss and not coverage." (citing Hawkinson Tread Tire Serv. Co. v. Ind. Lumbermens Mut. Ins. Co., 245 S.W.2d 24, 24, 28 (Mo. 1951))). Thus, the invocation of the appraisal provision would not abridge either party's right to challenge a coverage issue, including CIC's right to deny the claim. Nor did the appraisal provision, which divided the cost of appraisal equally, abridge the insured's potential rights under

Missouri's vexatious refusal statute, Mo. Rev. Stat. § 375.420. As the Missouri Supreme Court has reasoned, "[t]he existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." DeWitt v. Am. Family Mut. Ins. Co., 667 S.W.2d 700, 710 (Mo. 1984).

The district court properly afforded the appraisal provision its plain meaning in determining it was unambiguous, enforceable, and did not abridge the Trust's rights under Missouri's vexatious refusal statute.

### 3. Waiver

The Trust argues the district court erred in not finding CIC waived its right to invoke the appraisal provision. According to the Trust, CIC failed to comply with the provision's requirement to select an appraiser within the requisite time. The Trust further argues CIC did not attempt to enforce the appraisal provision until its prayer for relief in its motion for summary judgment on the declaratory judgment count, in which CIC asked the district court to stay the case and to order the parties to engage in the appraisal process. We disagree.

After receiving the Trust's proof of loss statement and paying the Trust the undisputed ACV of $800,000, CIC unequivocally initiated the appraisal provision in its letter of April 19, 2011: "This letter is to serve as [CIC]'s written demand for appraisal of the disputed portions of this loss." J.A. at 164-65. In its response on April 20, the Trust acknowledged CIC's demand for appraisal and in the very next sentence established its position that "using the appraisal process to determine the disputed portions of the loss under the Policy is completely unproductive," asserting CIC was in breach of the policy and that its breach would not be resolved through the appraisal process. J.A. at 166. The letter went on to advise CIC that "in lieu of pursuing the remedies available to the Insured at law, in equity, and/or under the Policy, the Insured is willing to consider a settlement and resolution of all matters

related to the Policy and the Claim." J.A. at 168. The Trust proceeded to suggest sums for which it would be willing to settle the claim. Id. CIC's response on May 2, definitively rejected the Trust's settlement demand and made its "second request for appraisal." J.A. at 171-72. The Trust's reply on May 4 did not retract the Trust's position rejecting the efficacy of appraisal but instead sought assurances that CIC "agree[d] to be bound by the outcome of the appraisal process," restated its contention that there were unresolved matters with respect to the Trust's claim under the policy, and informed CIC that the Trust "will be filing legal action seeking resolution of those unresolved matters within the next few days." J.A. at 173. In its final pre-litigation communication to the Trust on May 11, CIC responded that the terms and conditions of the appraisal process were binding on both the insured and the insurer and invited the Trust to clarify the unresolved matters to which it referred. The Trust answered by filing the lawsuit seven days later. As such, the Trust's written communication coupled with its conduct—most notably filing a lawsuit against CIC—demonstrated its decision not to participate in the execution of a valid policy provision.

In support of its waiver argument, the Trust asserts that *arbitration* clauses are inserted in policies for the protection of the insurers who profit off delays caused by resolution conflicts. See Appellant Br. 34-35. Relying on the dissent in Riley v. State Farm Mutual Automobile Insurance Co., 420 F.2d 1372 (6th Cir. 1970), the Trust asserts "[w]here insurers recognize the existence of arbitrable disputes, they have the duty to go forward with, or expedite, arbitration. Where they fail to do so, they waive their right to arbitrate," and "[h]aving impliedly waived by its actions the right to arbitrate the dispute, [the insurer] could not revive it by subsequent acts." Id. at 1378, 1379 (Celebrezze, J., dissenting).

Riley is distinguishable from the present case. First, the above-quoted language from Riley, upon which the Trust relies, is from the dissent in that case. Id. The Riley majority held the insurer had not waived the arbitration provision and the

delay at issue in the case had been caused by the insured. Id. at 1377. To the extent Riley applies at all, it does not support the Trust's position. Second, Riley applied Michigan law to determine the enforceability of an arbitration provision, not an appraisal provision. Id. at 1376 n.3. Missouri law, which governs this dispute, has long recognized the distinction between arbitration clauses and appraisal provisions. See Dworkin v. Caledonian Ins. Co., 226 S.W. 846, 848 (Mo. 1920) (distinguishing arbitration clauses, which send the entire controversy to a different tribunal and often divest the court of jurisdiction, from appraisal provisions, which simply have appraisers set the amount of loss).

The Trust's attempt to recast its response to CIC's letter invoking the appraisal provision as simply seeking assurances from CIC rings hollow. The Trust took a definitive position against appraisal, referring to it as completely unproductive, and advised CIC it would be filing a breach of contract action within days. We decline the Trust's invitation to view CIC's failure to identify an appraiser within the requisite time in a vacuum. Rather, CIC's response was a reflection of the Trust's declaration of its position regarding appraisal, and its stated intention to file a lawsuit, which the Trust carried out.

We similarly reject the Trust's assertion that CIC waited several years into the second lawsuit before seeking to proceed with appraisal and therefore waived enforcement of the appraisal provision. The Trust, not CIC, filed the lawsuit after declining to engage in the appraisal process. Moreover, on February 22, 2013, two months after the Trust filed the second lawsuit, CIC filed its answer and raised as its third affirmative defense that the Trust breached the policy's appraisal provision by refusing to participate in appraisal. In its prayer for relief, CIC asked the court to declare the provision unambiguous and binding as to the amount of covered damages.

The district court properly concluded CIC did not waive the appraisal provision.

#### 4. Amount of Loss

The Trust argues the district court erred in submitting the valuation of replacement cost as well as actual cash value for appraisal because CIC never invoked appraisal for replacement cost.

The language of the appraisal provision directs that the parties' selected appraisers are to "state separately the value of the property and *amount of loss*." J.A. at 176 (emphasis added). The district court ordered, "The parties shall participate in the appraisal provision *as outlined in the Policy*." Olga Despotis Tr., 2014 WL 5320260, at *8 (emphasis added). Furthermore, when CIC invoked the appraisal provision in its April 19 letter, CIC detailed the parties' valuation differences. In its May 11 letter, CIC reiterated that "the purpose of the appraisal process is to resolve all disputes regarding covered damages . . . ." J.A. at 174. The Trust's contention that there was no basis for the district court to order appraisal of all covered damages, including replacement cost, is unfounded.[5]

### B. Dismissal of Breach of Contract Claim

The Trust's second point of error argues that the district court erred by granting summary judgment in favor of CIC on the Trust's breach of contract claim. Specifically, the Trust argues the district court entered judgment without addressing the theories pled in its complaint, including that CIC anticipatorily breached the appraisal and rebuilding provisions of the contract.

---

[5]The Trust also argues that the district court erred in ordering appraisal because CIC never requested that affirmative relief. We disagree. By requesting a declaration that the appraisal provision was unenforceable (count three), the Trust brought the provision into play, which allowed CIC to defend against such a declaration. In addition, as previously discussed, CIC's answer to the complaint denied the Trust's allegation that the provision was invalid and unenforceable and raised various affirmative defenses, including that the Trust breached the appraisal provision, and in its prayer for relief, CIC asked the court to find the appraisal provision unambiguous and binding as to the amount of covered damages.

### 1. Loss Provision

The policy's loss provision states as follows:

(a) We will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

> 1) The Limit of Insurance under this policy that applies to the lost or damaged property;
> 2) The cost to replace, on the same "premises", the lost or damaged property with other property:
>> a) Of comparable material and quality; and
>> b) Used for the same purpose; or
> 3) The amount that you actually spend that is necessary to repair or replace the lost or damaged property.
> If a building is rebuilt at a new premises, the cost is limited to the cost which would have been incurred had the building been built at the original "premises".

(b) You may make a claim for "loss" covered by this insurance on an "actual cash value" basis instead of on a replacement cost basis. In the event you elect to have "loss" settled on an "actual cash value" basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the "loss".

(c) We will not pay on a replacement cost basis for any "loss":

> 1) Until the lost or damaged property is actually repaired or replaced with other property of generally the same construction and used for the same purpose as the lost or damaged property; and
> 2) Unless the repairs or replacement have been completed or at least underway within 2 years following the date of "loss".

J.A. at 175.

The appraisal ordered by the district court determined the ACV of the property to be $1,056,000, which was $256,000 more than CIC's initial estimate and payment.

After paying the Trust the additional $256,000, CIC moved for summary judgment on the remaining breach of contract and vexatious refusal claims. In its order granting summary judgment in CIC's favor, the district court noted that the Trust insisted its breach of contract claim was based on the theory that CIC breached the policy by not paying the correct ACV in March 2011 and that the Trust specifically denied that its breach of contract claim was based on an anticipatory breach theory. The district court found there was no breach of contract as a matter of law since there was no wrongful refusal to pay. The court detailed that CIC paid the undisputed portion of loss shortly after the proof of loss was submitted and that the Trust was required to the engage in the appraisal process with respect to the disputed loss amounts. The court concluded the Trust's cause of action for breach of contract could not accrue until completion of the appraisal process, and thus the Trust could not base a breach of contract claim on CIC's payment in 2011. Regarding the Trust's failure to initiate the rebuilding process within two years of the loss, the court was unpersuaded by the Trust's argument that CIC's undervaluation of the ACV prevented the Trust from rebuilding or that the additional $256,000 ACV would have caused the Trust to start the rebuilding process. The court concluded the Trust's failure to start the rebuilding process within two years as required by the replacement cost provision was fatal to its breach of contract claim.

As with the appraisal provision, the policy's replacement cost provision was clear and unambiguous, and therefore the district court was required to enforce the provision as written. See Floyd-Tunnell v. Shelter Mut. Ins. Co., 439 S.W.3d 215, 217 (Mo. 2014). Courts applying Missouri law have found when a policy requires repair or replacement of the damaged property as a condition precedent to receiving payment for the repair or replacement costs, the insurer has no obligation to pay that amount unless or until repair or replacement occurs. See Porter v. Shelter Mut. Ins. Co., 242 S.W.3d 385, 394 (Mo. Ct. App. 2007); Kastendieck v. Millers Mut. Ins. Co. of Alton, Ill., 946 S.W.2d 35, 40 (Mo. Ct. App. 1997); see also Federated Mut. Ins. Co. v. Moody Station & Grocery, 821 F.3d 973, 977-78 (8th Cir. 2016). It is

undisputed that the replacement process was neither complete nor underway within two years of the date of loss as required under the policy.

The district court also found the Trust failed to produce any evidence to support its contention that CIC breached the contract in the administration of the Trust's claim other than the Trust's assertions of general dissatisfaction in the manner with which CIC handled its claim. The court also discussed Dr. Despotis deposition testimony that he attended several meetings with CIC and submitted bids for rebuilding but was repeatedly put off by CIC. The district court noted that the Trust had not produced any dates for the supposed meetings with CIC about replacing the building nor any documentation regarding replacement bids. The district court concluded because the Trust failed to repair or replace the building within two years of the loss, as required under the replacement cost provision of the policy, CIC was under no obligation to pay the Trust the replacement cost. Therefore, CIC could not have breached the policy by failing to do so.

Relying on Bailey v. Farmers Union Co-operative Insurance Co., 498 N.W.2d 591, 594 (Neb. 1992), the Trust argues it should not be barred from recovery for failing to rebuild within the time constraints of the policy because it was unable to initiate the building process due to CIC's refusal to give assurances that replacement costs would be covered. In Bailey, the home of the insured—a disabled single mother—collapsed during renovations, resulting in a total loss. Id. at 598. The insurer sought to avoid the claim under various defenses. Id. at 594-96. The record contained correspondence from the insurer to the insured misrepresenting the policy's coverage, offering last chance-type settlement demands, and threatening litigation. Id. at 595-96. The record also contained the insurer's field agent's notes, which proposed ways the insurer could deny the claim. Id. Although the insurer did provide an ACV calculation of $11,900 to the insured, it was presented as a "final settlement," and not as the undisputed ACV amount to be used as seed money. Id. at 596. The insured rejected that offer and presented the insurer with her own ACV ($16,700) and

replacement cost ($50,449) calculations. Id. The insurer responded that its ACV calculation was the total value of the claim and the replacement cost would not be covered, directly misrepresenting the policy provision. Id. The insured sued the insurer for breach of contract and in tort for mental anguish. Id. at 597. Following a bench trial, the court concluded, inter alia, that the insured's failures to rebuild and to claim replacement costs within the requisite time frame was excused, reasoning the insurer's relentless conduct, which the court described as almost criminal, prevented the insured from complying with the policy provision. Id. The decision was affirmed on appeal. Id. at 605.

The present case is distinguishable from Bailey. In Bailey, the insurer never provided the insured with the undisputed ACV. Rather, the insured was sent a "settlement offer" with a check for the insured's calculated ACV and a notice that if the insured "did not accept the settlement offer, [the insurer] 'would have no alternative' but to withdraw the offer and prepare to defend itself in court." Id. at 595-96. Here, CIC paid the undisputed ACV of $800,000 within fifteen days of the Trust submitting its proof of loss, which the Trust accepted, and the undisputed ACV was not, as in Bailey, presented as a settlement offer. CIC clearly acknowledged that a dispute remained about whether CIC owed the Trust additional payments by invoking the appraisal provision. Further distinguishable is that the record in Bailey contained ample evidence of the insurer's delays and attempts to avoid the claim altogether. Id. at 597. Here, the Trust, not CIC, refused to comply with policy provisions, presented the insurer with settlement offers, and threatened litigation. Record evidence in Bailey included the field agent's notes, suggesting ways the insurer could avoid the claim, as well as letters from the insurer to the insured advising her to accept the settlement offer or face litigation and that the insurer did not have to pay the replacement cost. Id. at 595-96. Here, the only evidence supporting the Trust's allegation that CIC frustrated its attempts to rebuild is Dr. Despotis' deposition testimony, in which Dr. Despotis stated that CIC dodged Dr. Despotis' requests for confirmation that CIC would pay the rebuilding cost. The

Trust argues that by disregarding this testimony, the district court improperly made a credibility determination. While the Trust is correct that credibility determinations "are jury functions, not those of a judge . . . ruling on a motion for summary judgment," Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 614–15 (8th Cir. 2014) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)), the district court did not make a credibility determination in this instance. Dr. Despotis' testimony merely recounted his version of the dispute at the core of CIC's invocation of the appraisal provision—the value of the loss—a process the Trust rejected as "unproductive." The district court did not improperly weigh evidence in concluding the Trust's failure to take any steps toward rebuilding was fatal to its breach of contract claim.

## 2. Anticipatory Breach

On appeal, the Trust argues that the district court erred in dismissing its breach of contract claim by failing to consider its viable cause of action for anticipatory breach of the policy. Before the district court, however, in its reply to its own motion for summary judgment, the Trust categorically denied that either its breach of contract or vexatious refusal claim was based on a theory of anticipatory breach:

> D. Plaintiff Does Not Claim Anticipatory Repudiation.
> Cincinnati misconstrues the Trust's claim to this Court as one for "anticipatory repudiation". . . . The Trust pled breach of contract (Count I) for failure to provide replacement cost (Count I) . . . . The Trust pled vexatious refusal to pay (Count II) . . . . Directly as a result of these breaches, the Trust simply could not "rebuild" the Property. In fact, Cincinnati's actions were a manifestation of its intent (in 2011 and currently) to avoid its contractual obligations under the Policy by delaying payment of a properly calculated ACV so as to prevent the Trust from rebuilding. In so doing, it was unreasonable and vexatious in its conduct. These are not claims for anticipatory repudiation.

Appellee's Add. 7.

When a party did not make an argument in the district court, it "may not raise an issue for the first time on appeal as a basis for reversal." Westfield Ins. Co. v. Robinson Outdoors, Inc., 700 F.3d 1172, 1176 (8th Cir. 2012). Nonetheless, even if the Trust preserved such a claim, it fails. "Missouri has recognized the doctrine of anticipatory breach by repudiation. But such a repudiation is shown only by the disclosure of a positive intention not to perform the contract, by express statements or otherwise." Ewing v. Miller, 335 S.W.2d 154, 158 (Mo. 1960) (citation omitted). The Trust has presented no evidence that CIC demonstrated the requisite positive intention not to perform the contract. The evidence shows CIC paid the undisputed ACV within fifteen days of the Trust's submission of the loss and initiated the contract's appraisal provision. The Trust, on the other hand, demonstrated a manifest intent not to perform, which is evinced in its communications with CIC in April and May 2011. To the extent the Trust asserted a claim for breach of contract based on an anticipatory breach theory, the claim fails. The district court committed no error in finding the Trust's breach of contract claim failed as a matter of law.

## C.     Dismissal of Vexatious Refusal Claim

On appeal, the Trust argues the district court erred in granting CIC summary judgment on "All Remaining Counts of Plaintiff's Complaint," Appellant's Br. 40, and does not separately address the dismissal of the vexatious refusal claim. The Trust's only reference to that claim is in the conclusion of its initial brief, stating "CIC breached the insurance policy and that its conduct was vexatious," and requesting a "statutory penalty and attorneys' fees it has spent in trying to obtain the benefits of its insurance policy." Appellant's Br. 58.

To establish a claim under Missouri's vexatious refusal statute, Mo. Rev. Stat. § 375.296, the Trust had to prove "(1) [it] had an insurance policy with [CIC]; (2) [CIC] refused to pay; and, (3) [CIC's] refusal was without reasonable cause or excuse." See Mo. Bank & Tr. Co. of Kansas City v. OneBeacon Ins. Co., 688 F.3d 943, 948–49 (8th Cir. 2012) (first alteration in original) (quoting Dhyne v. State Farm

Fire & Cas. Co., 188 S.W.3d 454, 457 (Mo. 2006)).  The district court granted CIC's motion for summary judgment on the vexatious refusal claim, reasoning the Trust failed to state a claim for breach of contract and CIC was justified in its actions, and that there could be no vexatious refusal to pay the ACV amount determined through the appraisal process, until the completion of that process.

"The law is well-settled that for an insured to obtain a penalty for an insurance company's vexatious refusal to pay a claim, the insured must show that the insurance company's refusal to pay the loss was willful and without reasonable cause or excuse . . . ."  Watters v. Travel Guard Int'l, 136 S.W.3d 100, 108 (Mo. Ct. App. 2004).  There is no evidence in the record to support the contention that any refusal to pay was without reasonable cause or excuse.  CIC timely paid the undisputed ACV and invoked the appraisal process.  While the umpire determined the ACV to be $1,056,000, which was $256,000 more than the $800,000 CIC paid the Trust, CIC promptly paid that difference.  This conduct belies the Trust's assertion that CIC acted unreasonably.  Furthermore, in its submission of its proof of loss, the Trust calculated an ACV of $1,400,000.  Faced with a $600,000 calculation difference, it was not unreasonable for CIC to pay the Trust the undisputed amount and invoke appraisal.  We also note that CIC's initial ACV calculation was closer to the appraisers' (eventual) calculation than was the Trust's.  The district court properly granted CIC summary judgment on the Trust's vexatious refusal claim.

## III.  CONCLUSION

For the foregoing reasons, we affirm the grant of summary judgment in favor of CIC.

_____